**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Candice GEIGER, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 5, 2007.
Filed Feb. 26, 2008.

David S. Rudenstein, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., for Com., appellee.

BEFORE: KLEIN, BENDER and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Candice Geiger appeals the judgment of sentence for third degree murder and criminal conspiracy[1] on grounds that the evidence was insufficient to sustain the verdicts; and her constitutional right of confrontation was denied when the trial court permitted child witnesses to testify by way of videotape. We affirm.

¶ 2 The factual and procedural history of this case reveals that in the fall of 2002, Appellant's sister (co-defendant TB) left her four children (AB–1, age 10; AB–2, age 6; PB–1, age 4; and PB–2, age 3) in the custody of Appellant and co-defendant Jerry Chambers. Appellant and Chambers thereafter physical and sexually assaulted the young girls on a regular basis, which abuse culminated with the death of PB–2 while in the care and custody of Appellant and Chambers on the 17th day of August, 2002.

---

1. Appellant was also charged with and convicted of endangering the welfare of children, but this conviction was not appealed. *See* Appellant's brief, at 8.

¶ 3 The events leading up to PB–2's murder were detailed in the trial court's opinion; to-wit:

[Appellant] and her boyfriend, Jerry Chambers, a named co-defendant [ . . . ] lived in an apartment located at 1705 South 5th Street in the [C]ity and [C]ounty of Philadelphia. (N.T. 5/3/05, pg. 111). [TB], also a named co-defendant [ . . . ], the mother of [AB–1, AB–2, PB–1, and PB–2], left her daughters in the care of Chambers in the [f]all of 2002. *Id.* For a brief period, [TB] would drop her children off at Chambers['] apartment in the morning, and return later in the evening to pick them up. (N.T. 5/12/05, pgs. 135–136). Initially, she paid Chambers a nominal amount to care for the children. (N.T. 5/3/05, pg. 112). Prior to Thanksgiving of 2002, Chambers suggested to [TB] that the children should stay overnight with him. (N.T. 5/12/05, pgs. 135–136). After this arrangement began, [TB's] interaction with the children became more infrequent. (N.T. 5/12/05, pages 135–136). Ultimately, [TB] did not see her children at all between Easter of 2003 and the date of these incidents, August 17, 2003. ( [N.T.] 5/12/05, pg. 138).

Sometime during this period, [Appellant], [TB's] sister, moved in with Chambers. (N.T. 5/3/05, pgs. 70–72).[TB] was initially unaware of this relationship and at no time did [TB] ever discuss her daughters and their care with Chambers or [Appellant]. (N.T. 5/13/05, pgs. 70–72). When [TB] learned that her sister lived with Chambers, [Appellant] told her not to let any family members know that she lived at the apartment. (N.T. 5/13/05, pgs. 7[0]–71). On numerous occasions, Chambers would pack [Appellant's] clothes, walk her to the door and try to make her leave. (N.T. 5/13/05, pg. 14). On each occasion, [Appellant] refused to leave the apartment. *Id.*

Chambers, [Appellant] and the girls lived in deplorable conditions. The apartment consisted of two bedrooms, a bathroom, living area and a kitchen. (N.T. 5/3/05, pgs. 30–32). The girls slept in the same small bedroom as Chambers and [Appellant] on a dirty mattress on the floor placed in a corner of the room. *Id.* The overwhelming stench of urine permeated the entire dwelling. (N.T. 5/3/05, pg. 15). The apartment was "absolutely filthy and your feet stuck to the floor as you walked through the apartment." *Id.* at 17. The apartment was "fly infested," and numerous dead cockroaches lay scattered on the floor. *Id.*

A child's potty chair sat in the kitchen filled with urine and fecal matter. *Id.* Two pit bulls also lived in the apartment. (N.T. 5/5/05, pg 111). An interior door to the bedroom was nailed shut from the inside, which prevented any exit from the room. Next to the door was a window that was completely covered in dark plastic. *Id.*

Chambers regularly beat [AB–1, AB–2, PB–1, and PB–2], with an extension cord, a metal pole, belt buckles, and a broomstick. (N.T. 4/20/05, pgs. 22–24, 39). Chambers also beat [AB–1] more than once with his bare fists—repeatedly punching her until her eyes were swollen shut. (N.T. 4/20/05, pg. 24). The results of the beatings were so obvious that when the children were permitted outside or if anyone visited, Chambers ordered them to cover their faces and bodies to hide the severe bruising. (N.T. 4/20/05, pg[s]. 26, 33). Inexplicably, [AB–1] and [PB–1] were beaten more often than the other two girls. (N.T. 4/20/05, pg. 38). At various times, each of the children were [*sic* ] locked in the basement with Chamber's pit bulls. (N.T. 5/5/05, pgs. 111–112). The girls were terrified of the dogs. *Id.* at 155.

The children were fed sporadically and inconsistently. (N.T. 4/20/05, pg. 24). It was not uncommon for one or more of the girls to be forced to eat "dog poop" out of the dog's food bowl. (N.T. 4/20/05, pgs. 11–12, 25).

[Appellant] was an active participant in the abuse of the children. [Appellant] would beat any of the girls when they "did something wrong—may be every other day[.]" (N.T. 5/3/05, pg. 116). [Appellant] and Chambers would smack, punch, and kick the girls. *Id.* [Appellant] also invited unknown men into the apartment through the back door while the girls were home, but while Chambers was out. (N.T. 5/13/05, pgs. 10–11).

On the night [PB–2] died, August 17, 2003, [Appellant] forced her to eat a sandwich by smacking her face and repeatedly hitting her in the stomach with a belt. (N.T. 5/3/05, pgs. 113–114). Later that night, [Appellant] and Chambers watched *pornographic* movies in the young girls' presence. (N.T. 4/22/04, pgs. 45–46). [Appellant] told [AB–2] to later tell the police following [PB–2's] death that they were all watching a children's video. *Id.* Sometime after midnight that same evening, Chambers and [Appellant] were having sex. (N.T. 5/3/05, pg. 115). Chambers told [PB–2] to stop watching them, but when she did not comply, Chambers called her over to his bed and hit her with an extension cord and smacked her in the face multiple times. (N.T. 4/22/05, pgs. 38–39; 5/3/05, pgs. 114–115). [Appellant] told Chambers to throw [PB–2] against the wall. (N.T. 4/22/05, pg. 40). [AB–2]

watched as Chambers grabbed [PB–2] by the feet and threw her across the room. [PB–2] struck her head on the radiator and slid down the wall. (N.T. 4/22/05, pgs. 40–41).

[PB–2] was pronounced dead on arrival at Methodist Hospital. (N.T. 5/2/05, p[g]. 13). [AB–1] was found hiding on the second floor of the building. A towel covering her head with both her eyes swollen shut. (N.T. 5/4/05, pgs. 18–23). The surviving girls were taken to the Children's Hospital of Philadelphia to be treated for their injuries. (N.T. 4/20/05, pgs. 16–18).

Trial court opinion, 3/19/07, at 2–5.

¶ 4 Appellant and her co-defendants were arrested, tried jointly, and found guilty of the above-stated offenses.[2] Appellant was sentenced to serve an aggregate term of 17 to 34 years imprisonment. This appeal followed raising two questions for our review; to-wit:

I. Is [Appellant] entitled to an arrest of judgment on the charges of Murder in the Third Degree and Criminal Conspiracy where the Commonwealth did not prove those charges beyond a reasonable doubt and where there is not sufficient evidence to sustain the verdict?

II. Is [Appellant] entitled to a new trial as the result of [c]ourt error where the [trial c]ourt abused its discretion and erred as a matter of law when it permitted a then alleged child witness to testify via videotape, thus depriving [Appellant] of her right of confrontation, all in violation of the United States Constitu-

---

2. In particular, co-defendant Chambers was convicted of first-degree murder and sentenced to death, while co-defendant TB was convicted of multiple counts of endangering the welfare of children and conspiracy and sentenced to an aggregate term of imprisonment of 20 to 40 years.

The appeal of co-defendant TB is presently listed before this Court at No. 2108 EDA 2005; J–S59003/07, and the capital appeal of co-defendant Chambers is before the Pennsylvania Supreme Court at No. 489 CAP.

tion [and] the Pennsylvania Constitution [ . . . ]?

Appellant's brief, at 3.

¶ 5 Appellant's initial challenge to the sufficiency of the evidence requires that we view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth in deciding whether the evidence was sufficient to establish each element of the crimes beyond a reasonable doubt. *Commonwealth v. McNair*, 529 Pa. 368, 371, 603 A.2d 1014 (1992).

¶ 6 Moreover, " '[w]hen conflicts and discrepancies arise, it is within the province of the jury to determine the weight to be given to each [witness's] testimony and to believe all, part, or none of the evidence as [it] deems appropriate.' " *Commonwealth v. Wright*, 722 A.2d 157, 161 (Pa.Super.1998) (*quoting Commonwealth v. Verdekal*, 351 Pa.Super. 412, 506 A.2d 415, 419 (1986)).

¶ 7 To convict an accused of third degree murder, the Commonwealth must prove that the accused killed another person with malice. *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa.Super.2007).

The elements of third degree murder, as developed by case law, are a killing done with legal malice but without specific intent to kill required in first degree murder. Malice is the essential element of third degree murder, and is the distinguishing factor between murder and manslaughter.

*Commonwealth v. Cruz–Centeno*, 447 Pa.Super. 98, 668 A.2d 536, 539 (1995), *allocatur denied*, 544 Pa. 653, 676 A.2d 1195 (1996).

¶ 8 Malice under the law "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intending to be injured." *Commonwealth v. Thomas*, 527 Pa. 511, 514, 594 A.2d 300 (1991). "Malice may be inferred from the 'attending circumstances of the act resulting in death.' " *Commonwealth v. Lee*, 426 Pa.Super. 345, 626 A.2d 1238, 1241 (1993) (*quoting Commonwealth v. Gardner*, 490 Pa. 421, 424, 416 A.2d 1007 (1980)). Otherwise stated, malice may be found where the defendant has consciously disregarded an unjustified and extremely high risk that her conduct might cause death or serious injury to another. *Commonwealth v. Young*, 494 Pa. 224, 228, 431 A.2d 230 (1981).

¶ 9 To convict of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. 18 Pa. C.S.A. § 903; *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa.Super.1998), *allocatur denied*, 559 Pa. 689, 739 A.2d 1056 (1999). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173, 1177 (1994). "An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Rivera*, 432 Pa.Super. 88, 637 A.2d 997, 998 (1994) (*en banc* )

¶ 10 Once a conspiracy is established, the actions of each co-conspirator may be imputed to the other conspirators. In this regard, "[t]he law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design." *Commonwealth v. Baskerville*, 452 Pa.Super. 82, 681 A.2d 195, 201 (1996). Furthermore,

> Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties.

*Commonwealth v. Eiland*, 450 Pa. 566, 570–71, 301 A.2d 651 (1973).

¶ 11 Herein, as is evident from a recitation of the law associated with establishing guilt beyond a reasonable doubt for third degree murder and criminal conspiracy, we need the benefit of a trial transcript to evaluate the merits of Appellant's insufficiency of the evidence claim. This void has been filled but not before a period of time elapsed from the trial court's transmittal of the certified record filed with this Court on March 26, 2007, until this Court's receipt of the thirty-six (36) volumes of testimony on January 17, 2008.[3]

¶ 12 Appellant's initial challenge revolves around the contention that she took no active part in the murder of the minor-child PB–2, and, as such, cannot be held accountable for her niece's death. We think otherwise. Evidence linking Appellant to PB–2's death was elicited from AB–2, who recalled with clarity living with her three sisters (AB–1; PB–1; and PB–2), codefendant Chambers, and Appellant immediately preceding PB–2's murder. She recounted being awakened by PB–2's crying, which caused co-defendant Chambers to grab PB–2 by the feet and throw her behind the bed at Appellant's direction; to-wit:

[Assistant District Attorney]:

Q. And how far did [PB–2] get thrown across the room?

[AB–2]:

A. Where their bed at [*sic*].

Q. And where did she land?

A. She—she landed behind the bed.

Q. And who threw her?

A. Jerry [Chambers].

Q. Did anyone tell Jerry to throw her?

A. [Appellant].

Q. Okay. And did—what did Jerry grab [PB–2] by in throwing her?

A. Her feet.

Q. And what—what did [PB–2] hit when she went across the room?

A. She hit the radiator.

Q. And—okay. And after she hit— what part of her body hit the radiator?

A. Her head.

---

**3.** We will not speculate upon the reasons for the inordinate delay in providing a completed record to this Court, but we note it for the purpose of appreciating the constraints affecting this Court's time-table for reviewing Appellant's claims and disposing of the same.

Q. And was there any part of her head that was hurt that you say later as a result of her—

A. In the morning I saw it.

Q. Okay. And what did you see on her head?

A. I saw the line, I saw the line on her head.

\*   \*   \*   \*   \*   \*

Q. Okay. Before that, did anyone ever take [PB–2] off the—off the radiator and throw her behind the bed?

A. Jerry.

N.T. Trial (Jury) Volume I, 4/22/05, at 40–42; *see also Id.* at 54 (AB–2: Chambers "grabbed [PB–2] by the feet and threw her."), at 56 (AB–2 answered, "Yes" to the question posed by Appellant's attorney: "And you said at some point in time your Aunt [Appellant] said throw her against the wall?"). When AB–2 tried to assist the victim off the floor after being thrown, Chambers "told [AB–2] not to help her." *Id.* at 56. And, albeit Appellant phoned 911, she told AB–2 to tell police that they were watching a family oriented movie ("Cheetah Girls") instead of pornography. *Id.* at 45. Further, AB–1, AB–2, and PB–1 each testified that Chambers and Appellant both administered corporal punishment with extension cords, belts, and broomsticks upon the children "for a long time" for minor infractions: keeping a door open and washing dishes late. *Id.* at 9–10, 19, 38–39, and 47. Finally, PB–2

recounted that Chambers and Appellant hit PB–2 before throwing her against the wall. *Id.* at 65.

■ ¶ 13 The law is well-settled that conspirators are responsible for the actions of their cohorts, whether such conduct is planned by the consortium or engaged in by a conspirator without prior approval of the group. *See Eiland, supra; Baskerville, supra.* Herein, this translates into Appellant being accountable for Chambers' throwing PB–2 across the bedroom (at Appellant's insistence), causing PB–2 to strike her head on a radiator (and her resultant death [4]), and dissuading AB–2 from rendering assistance to her sister (PB–2).

¶ 14 Viewing the facts in a light most favorable to the verdict-winner, and drawing all reasonable inferences therefrom, we find that the evidence was sufficient in quantity and quality to sustain Appellant's convictions for third degree murder and criminal conspiracy, which manifested itself in the hardness of heart, cruelty, and recklessness of consequences associated with the manner and method of PB–2's death. *Thomas, supra;* 18 Pa.C.S.A. § 903.

■ ¶ 15 Next, we address Appellant's claim that a new trial is warranted because the court erred in permitting child witnesses to testify *via* videotape, which was unconstitutional because it deprived her of the right to confront witnesses and due process under the Pennsylvania and United States Constitutions.

---

4. Doctor Ian Hood, deputy medical examiner for the City and County of Philadelphia, opined that PB–2's manner of death was homicide. N.T. Trial (Jury) Volume 1, 5/2/05, at 63. PB–2's cause of death, opined by Dr. Hood within a reasonable degree of medical certainty, consisted of a combination of blunt trauma (30 to 40 bruises over her body, none of which occurred more than 1 week before her death), asphyxia (jammed between the side of the bed, the bed frame, and the radiator for a few hours compromised PB–2's ability to maintain her airway while she was probably semiconscious, unconscious until death occurred), and inanition (being in a weakened state, "It's like starvation," but it relates to the absence of care and attention in the child's life, which causes the child to waste away). *Id.* at 21, 59–61, and 63.

¶ 16 When reviewing a challenge to the constitutionality of a statute:

Initially, we note that a statute is presumed constitutional when it is lawfully enacted and will only be considered unconstitutional if it clearly, palpably and plainly violates the constitution. Furthermore, a party challenging the constitutionality of an act of the General Assembly has a "heavy burden" of persuasion to sustain his claim.

*Commonwealth v. Hanawalt,* 419 Pa.Super. 411, 615 A.2d 432, 434 (1992) (citations omitted). The videotape statute provides:

### § 5984.1. Recorded testimony

(a) **Recording.**—Subject to subsection (b), in any prosecution or adjudication involving a child victim or child material witness, the court may order that the child victim's or child material witness's testimony be recorded for presentation in court by any method that accurately captures and preserves the visual images, oral communications and other information presented during such testimony. The testimony shall be taken under oath or affirmation before the court in chambers or in a special facility designed for taking the recorded testimony of children. Only the attorneys for the defense and for the Commonwealth, persons necessary to operate the equipment, a qualified shorthand reporter and any person whose presence would contribute to the welfare and well-being of the child victim or child material witness, including persons designated under section 5983 (relating to rights and services), may be present in the room with the child during testimony. The court shall permit the defendant to observe and hear the testimony of the child victim or child material witness but shall ensure that the child victim or material witness cannot hear or see the defendant. Examination and cross-examination of the child victim or child material witness shall proceed in the same manner as normally permitted. The court shall make certain that the defendant and defense counsel have adequate opportunity to communicate for the purpose of providing an effective defense.

(b) **Determination.**—Before the court orders the child victim or the child material witness to testify by recorded testimony, the court must determine, based on evidence presented to it, that testifying either in an open forum in the presence and full view of the finder of fact or in the defendant's presence will result in the child victim or child material witness suffering serious emotional distress that would substantially impair the child victim's or child material witness's ability to reasonably communicate. In making this determination, the court may do any of the following:

(1) Observe and question the child victim or child material witness, either inside or outside the courtroom.

(2) Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child victim or child material witness in a medical or therapeutic setting.

(c) **Counsel and confrontation.**—

(1) If the court observes or questions the child victim or child material witness under section (b)(1), the attorney for the defendant and the attorney for the Commonwealth have the right to be present, but the court shall not permit the defendant to be present.

(2) If the court hears testimony under subsection (b)(2), the attorney for the defendant and the attorney for the Commonwealth have the right to be present.

December 18, 1996, P.L. 1077, No. 161, § 4, as amended July 15, 2005, P.L. 736, No. 87, § 4; 42 Pa.C.S.A. § 5984.1 (Supp. 2007).

¶ 17 This is the first occasion that the constitutionality of Section 5984.1 has been challenged. In *Commonwealth v. Louden,* 536 Pa. 180, 638 A.2d 953 (1994), our Supreme Court held the predecessor statute (Section 5984—videotape in closed-circuit television context) unconstitutional because it failed to protect a defendant's state constitutional right to a face-to-face confrontation with his accuser. In doing so, our Supreme Court stated, as herein relevant:

> In [*Commonwealth v.*] *Ludwig* [, 527 Pa. 472, 594 A.2d 281 (1991) ], we [ ... ] recognized that exceptions do arise to the strict application of Article I, Section 9. However, exceptions are permissible only after the original testimony is given in the presence of the defendant with the defendant having the opportunity to face and cross-examine his accuser. In such instances, the accused has had the opportunity to confront the witnesses against him, face to face.
>
> Finally, in *Ludwig,* we held that subjective fears of a witness without more are insufficient to restrict a defendant's important right of face-to-face confrontation.
>
> The principles addressed and objections raised in *Ludwig* are equally applicable in this appeal. Sections 5984 and 5985 fail to guarantee the defendant's right to confront his accusers. It is clear that these provisions are intended to provide protection to a child witness. While the legislature's motive may be laudable, *we cannot forget that our constitution specifically, clearly and unambiguously guarantees to an accused the right to face-to-face confrontation with his accuser. Such a constitutional right could not be more clearly enunciated. Accordingly, we hold that §§ 5984 and 5985 on their face are repugnant to our state constitution and therefore are invalid.*

*Louden,* at 188, 638 A.2d at 957 (emphasis added). At the time *Louden* and *Ludwig* were written, Article I, § 9 of our state constitution did not merely reflect a "preference" but required a "face-to-face" confrontation with one's accusers. *Louden,* at 188, 638 A.2d at 957.

¶ 18 Historically, the first attempt by our Legislature to orchestrate a revamping of the "face-to-face" confrontation element in Article I, § 9 came by way of a constitutional referendum that was for naught because "the ballot question encompassed amendments to both Article I, § 9 and Article V, § 10(c), but did not permit the electorate to vote separately upon each of the amendments in violation of Article XI, § 1." *Bergdoll v. Kane,* 557 Pa. 72, 87, 731 A.2d 1261, 1270 (1999). *Bergdoll* ended any discussion regarding how many ballot questions should be teased out of a constitutional amendment proposal—one per ballot proposal.

¶ 19 Ultimately, the statute under scrutiny here (Section 9584.1 reproduced *supra* ) was enacted by our Legislature on July 15, 2005, following a series of amendments to the Confrontation Clause in Article I, § 9, and our Supreme Court affirmed an order and opinion of the Pennsylvania Commonwealth Court upholding these amendments.[5] *Bergdoll v. Commonwealth,* 858

---

5. The 2003 amended version of Article I, § 9 states, as is herein relevant:

§ **9. Rights of accused in criminal prosecutions**

In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, *to be confronted with the witnesses against him* [ ... ].

A.2d 185 (Pa.Cmwlth.2004) (*en banc*), af-firmed, 583 Pa. 44, 874 A.2d 1148 (2005).

¶ 20 *Bergdoll* concerned attorneys in Pennsylvania seeking to void amendments to the Pennsylvania Constitution which affected criminal defendants' rights to confront witnesses and allowed the General Assembly to enact laws regarding the manner in which children could testify in criminal proceedings. The Court held, *inter alia*, that the removal of the "face to face" language from the confrontation clause of the Pennsylvania Constitution did not result in an infringement of the federally protected right of a criminal defendant to confront witnesses. Nor did the amendment allowing the General Assembly to enact laws regarding the manner in which children could testify in criminal proceedings violate the separation of powers doctrine. *Bergdoll*, 858 A.2d at 202–03.

¶ 21 Placing matters in perspective, Section 5984.1 authorizes the protocol to obtain recorded testimony in any prosecution involving a child victim or child witness "by any method that accurately captures and preserves the visual images, oral communications and other information presented during such testimony." Procedurally, the trial court conducted a hearing prior to trial to decide whether any of the child witnesses could testify in a courtroom setting and whether the videotape system was warranted. Present at the hearing were the prosecutor, Appellant's counsel, counsel for the codefendants, the court reporter, the psychiatric counselor for each of the child witnesses being interviewed, and the children's foster parents.

Trial court opinion, 3/19/07, at 6. In addition, Appellant could see and hear the testimony of each child witness by way of a monitor and speaker system. *See* N.T. Motion Volume 1, 4/19/05, at 157–60. However, at no time could the child witnesses see or hear Appellant. *Id.*, at 157–60.

¶ 22 Appellant would be able to cross-examine the child witnesses through her counsel by notifying the trial court that she wished to have a question posed, and a recess would take place to allow Appellant to interact with her counsel to formulate a question. *See, e.g.,* N.T. *Voir Dire* Volume 1, 4/22/05, at 13 (questioning of child witnesses took place in jury room), at 27 (the record reflected that counsel consulted with their clients, but there were no more questions asked of the child witnesses). Before the videotape questioning of the child witnesses began, the trial court heard testimony from the psychiatric therapist for each of the child witnesses, who opined that having a face-to-face confrontation with their alleged abusers would cause "severe emotional distress." N.T. Motion Volume 1, 4/19/05, at 92, 131–32. And, allowing the child witnesses to testify in the absence of the defendants and before trial began to avoid the glare of media exposure "would be a positive—more positive" for the child witnesses. *Id.*, at 94, 133. At the hearing, the clinicians opined that doing a videotape session of the questioning would be better for and impact favorably upon the child witnesses. *Id.*, at 134. "At the conclusion of that hearing, the trial court determined that by subject-

Article I, § 9, as amended November 4, 2003 (emphasis added). The 2003 amendment, which was proposed by Joint Resolution No. 1, 2002, P.L. _____, S.B. No. 211, and Joint Resolution No. 1, 2003, P.L. _____, S.B. No. 55, in the first sentence, substituted "be confronted with the witnesses against him" for "meet the witnesses face to face." The

amendment to Article I, § 9 relating to a defendant having the right to confront the witnesses against him renders it co-extensive with the Sixth Amendment to the United States Constitution, which states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right [ ... ] to be confronted with the witnesses against him."

ing the girls to testify in front of the [A]ppellant would cause the girls serious emotional distress, and would impair their ability to testify accurately and honestly. (N.T. 4/19/05, pgs. 157–160)." Trial court opinion, 3/19/07, at 6.

¶ 23 We find that the elemental aspects of Section 5984.1 were satisfied by the trial court; to-wit: 1) the testimony was obtained under oath before the trial court in a designated area for the taking of the testimony of the child witnesses; 2) only the attorneys for the Commonwealth and defense were present in the designated area, along with a court reporter, and any person whose presence would contribute to the welfare of the child witnesses; 3) the trial court permitted Appellant to observe and hear the testimony of the child witnesses but also ensured that the child witnesses could not hear or see Appellant; and 4) direct and cross-examination of the child witnesses proceeded in the same manner as normally permitted, and the trial court made certain that Appellant and her defense counsel had adequate opportunity to communicate for the purpose of providing an effective defense as mandated under 42 Pa.C.S.A. § 5984.1(a). Nowhere does Appellant dispute the fact that the trial court adhered to the procedural requirements set forth in Section 5984.1. *See* Appellant's brief, at 15–17.

¶ 24 Further, receiving the testimony of the child witnesses by way of videotape under Section 5984.1 did not violate the Confrontation Clause of either the state or federal constitutions, especially where the trial court made findings that testifying in court in the presence of Appellant would cause the child witnesses "severe emotional distress" that would impair their ability to communicate truthfully and accurately, which is a *sine qua non* to allowing videotape questioning of child witnesses.

¶ 25 The United States Supreme Court has recognized the difficulties that child victims may experience when they are asked to confront their abusers face-to-face. *See Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In *Craig*, the Court addressed the propriety of a child witness testifying at trial *via* closed-circuit television. In analyzing the Confrontation Clause of the Sixth Amendment of the United States Constitution, the Court articulated the purpose of that clause as ensuring "the reliability of the evidence against a defendant." *Id.*, at 845, 110 S.Ct. 3157. This purpose is satisfied when the witness testifies under oath, is subject to cross-examination, and the ultimate arbiter of facts is able to observe the demeanor of the witness. *Id.*, at 846, 110 S.Ct. 3157. The Court recognized that this right to face-to-face confrontation is not absolute and the state may infringe upon this right to protect a compelling state interest. *Id.*, at 846, 110 S.Ct. 3157. It identified the mental and physical well-being of a child as a compelling state interest that warrants infringement upon this constitutional right. Thus, the Court recognized an exception for closed-circuit television testimony where there is evidence that the child will suffer emotional distress and trauma from being confronted with the alleged abuser. *Id.*, at 846, 110 S.Ct. 3157. Finding that the trial court satisfied the elemental aspects of Section 5984.1, this Court finds no violation of the Confrontation Clause in Article I, § 9 of the Pennsylvania Constitution or its federal counterpart in the Sixth Amendment of the United States Constitution.

¶ 26 Appellant also argues that she was deprived of due process with respect to the testimony of child witnesses. We observe that Article I, § 9 of the Pennsylvania Constitution and the Fourteenth Amendment of the United States Constitution guarantee a defendant the right to due process of law. In the present case, as noted above, the trial court satisfied the

elemental aspects of Section 5984.1. Noteworthy to our due process analysis, the child witnesses' testimony was taken under oath, Appellant observed and heard the child witnesses' testimony, Appellant's counsel was able to cross-examine the child witnesses, and Appellant and her counsel had adequate opportunity to communicate during the child witnesses' testimony in order to mount a proper defense. Therefore, this Court finds that the trial court's adherence to Section 9584.1 satisfies Pennsylvania's due process rights of the accused regarding "confrontation" between an accused and a child witness. Accordingly, there is no merit to Appellant's due process challenge to Section 9584.1.[6]

¶ 27 This Court also finds that the amending of Article I, § 9 of the Pennsylvania Constitution in 2003 to substitute "be confronted with the witnesses against him" for "meet the witnesses face to face" takes this case outside the realm of *Louden, supra* (condemning as unconstitutional Sections 5984 and 5985(a) because neither failed to limit the use of videotape in closed-circuit television to those instances in which a defendant's right to face-to-face confrontation had been otherwise satisfied). Therefore, we reject Appellant's final challenge to Section 9584.1.

¶ 28 Accordingly, finding no merit to any of Appellant's challenges on appeal, we affirm the judgment of sentence.

¶ 29 Judgment of sentence affirmed.

---

6. As Pennsylvania's Constitution affords the same protection as its federal counterpart with regard to the Confrontation Clause, *see* Pa.Cons.Art. I, § 9 and *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), and with regard to due process, the United States Constitution does not afford any greater protection than Pennsylvania's due process clause; therefore, our finding that Appellant was not deprived of due process under Pennsylvania's Constitution also establishes that she was not deprived of due process under the United States Constitution. *See, e.g., Commonwealth v. Dodge,* 287 Pa.Super. 148, 429 A.2d 1143, 1149 n. 5 (1981).