J-S19004-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NADERA BATSON | |
| Appellant | No. 299 EDA 2014 |

Appeal from the Judgment of Sentence Entered December 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0000123-2012

BEFORE: STABILE, JENKINS, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.: **FILED JUNE 23, 2015**

Appellant, Nadera Batson, appeals from the December 16, 2013 judgment of sentence imposing an aggregate 28½ to 57 years of incarceration for third-degree murder, conspiracy, endangering the welfare of a child and possession of an instrument of crime.[1] We affirm.

The trial court summarized the pertinent facts in its Pa.R.A.P. 1925(a) opinion:

> Ashley Brewton [("Ashley")], the natural mother of the child decedent [JaQuinn Brewton ("JaQuinn")] in this case, allowed [Appellant] to take [JaQuinn] in during March of 2011 because she and her other children were moving into a shelter. Later, they fought over [Appellant's] attempt to gain legal custody of [JaQuinn]. Ashley Brewton last spoke with her son

---

[1] 18 Pa.C.S.A. §§ 2502(c), 903, 4304 and 907, respectively.

during May of 2011, and did not see him again until his hospitalization at [Children's Hospital Of Philadelphia ("CHOP")].

Marcus King, [Appellant's] boyfriend and codefendant, testified that they had started dating on December 7, 2009 and moved in together shortly thereafter. He met [Ashley] during that time and through [Appellant]. [JaQuinn] was [Appellant's] godson, and for a time [Appellant] and King lived with [Ashley] and her children. In January of 2011, when [Appellant] and King had moved to 4716 Chestnut Street, [JaQuinn] moved in with them. At that time, and until his death, [JaQuinn] had a limited vocabulary of approximately ten to thirty words, and called everyone, including King and [Appellant], 'mom.'

King acknowledged that during the months when [JaQuinn] lived with him and [Appellant], he occasionally 'put his hands' on [JaQuinn]. He saw [Appellant] strike [JaQuinn] almost daily, using her hands, a belt, a brush, and a shoe. She would do this in response to [JaQuinn's] touching things that he was not supposed to touch. [JaQuinn] was not potty trained when he came to live with [Appellant], and she would beat him in order to punish failures to use his toilet trainer. On a few occasions, King intervened to stop the beatings, which he thought were excessive.

King noticed the burns on [JaQuinn's] feet, and purchased burn cream and gauze to treat him. King and [Appellant] discussed taking [JaQuinn] to the hospital for his foot burns, but were afraid that they might be arrested if they did so. One or two months later, when [JaQuinn] missed his toilet trainer and defecated onto the floor, [Appellant] burned his buttocks with a blowtorch that King had brought home from his job. King grabbed [JaQuinn] and took him into the bathroom, running cold water over his buttocks. When he did so, layers of skin came off in the flow of the water. King dressed his wound with burn cream and gauze. The night before [JaQuinn] was taken to CHOP, June 28, 2011, [JaQuinn] had trouble getting to sleep and kept getting out of his bed. [Appellant] beat him and then he went to sleep.

Hasan Babb, who lived in [Appellant's] apartment building at the time when [JaQuinn] was under [Appellant's] care, testified that the building had shared bathroom and kitchen areas, and that he resided in the room next door to [Appellant]. He said that on several occasions he heard [Appellant] refer to

[JaQuinn] as 'little motherfucker' or 'this little nigger.' In the weeks before [JaQuinn's] death, there were several midday episodes during which he would hear loud music from [Appellant's] room, and then underneath the music what sounded like lashes and yelling and crying. He also heard [Appellant] say 'move your hands' multiple times, as well as 'stop crying,' 'shut up,' and 'sit still.' These episodes would occur approximately four times a week, and lasted for approximately one hour each.

At one point, Babb's girlfriend was with him in his room during one of the midday episodes of loud music, screaming, crying, and the sound of lashes, and she was upset by it. At her behest, Babb went to [Appellant's] room and knocked on the door. When [Appellant] answered, he commented that 'it' had been going on for a while, and she responded that she would turn the music off. That seemed to end that particular incident. On another similar occasion, Babb's door was cracked and he saw [Appellant] and [JaQuinn] walking to the communal bathroom and heard [Appellant] say, on her cell phone, 'this little motherfucker shitting the bed.'

Babb was troubled by what he heard, and he looked at the Department of Human Services ("DHS") website to learn how to make an anonymous tip about what he suspected was child abuse. He also sent a text message to his landlord, in hopes that he might be able to intervene and end the beatings. He wrote 'I ain't tryna [sic] get involved in other peoples [sic] matters. But this woman beats her kid nonstop for hours. Shit just don't seem healthy to me.'

On June 29th of 2011, at approximately 11:00 a.m., Lieutenant Dwayne Culbrath of the Philadelphia Fire Department was assigned to respond to an emergency call that a child had fallen down a flight of stairs at 4716 Chestnut Street in Philadelphia. When Culbrath arrived, he went to [Appellant's] room on the fourth floor of the apartment building, where he saw three-year-old [JaQuinn], dressed only in a diaper, who had no vital signs and appeared to be deceased. Culbrath spoke with [Appellant], who told him that she had seen [JaQuinn] fall down the stairs, stand up, and then slump against the wall. Culbrath saw that [JaQuinn] had multiple dark markings on his torso and arms. [JaQuinn] went on to spend two weeks in the hospital, and then perish from his wounds.

[…]

Numerous of [JaQuinn's] internal organs, including his pancreas, left adrenal gland, and liver, showed fibrosis, consistent with a rupture to the pancreas that causes enzymes to escape into the abdominal captivity and irritate the organs in that cavity. Dr. [Aaron Rosen, Associate Medical Examiner for the City of Philadelphia], found that the injury to [JaQuinn's] pancreas was not consistent with a fall down the stairs. Instead, it was consistent with a focused and concentrated blow to the area, as when a child falls into a handlebar while riding a bicycle, or when another person hits the child in the abdomen, either with a hand or a hard object. Because the pancreas is in the middle of the body, it is not typically injured in this directed way when a person falls down the stairs. Stair falls tend to cause injuries to the head and extremities of the body rather than the middle. Dr. Rosen determined that the cause of [JaQuinn's] death was blunt impact trauma and the manner of death was homicide.

Trial Court Opinion, 3/2/14, at 2-5, 7 (record citations omitted).

Police arrested Appellant on July 15, 2011 for the murder of JaQuinn Brewton. On August 12, 2013 a jury found Appellant guilty of the aforementioned offenses. The trial court imposed sentence on December 18, 2013 and Appellant filed a timely post-sentence motion on December 23, 2013. The trial court denied Appellant's post-sentence motion on December 30, 2013. This timely appeal followed.

Appellant raises three questions for our review:

I.  Is [Appellant] entitled to an arrest of judgment on the charge of Murder in the Third Degree and/or the charge of Criminal Conspiracy where the evidence is insufficient to sustain the verdict?

II.  Is [Appellant] entitled to a new trial on all charges where the verdict is against the weight of the evidence?

- 4 -

III.   Is [Appellant] entitled to a new trial as the result of Court error when the Court failed to grant a mistrial in the face of blatant prosecutorial misconduct?

Appellant's Brief at 3.

With his first two arguments, Appellant asserts the Commonwealth failed to prove malice in support of the murder conviction and failed to prove the parties reached a conspiratorial agreement.  In his third argument, Appellant asserts he is entitled to a new trial because the prosecutor called her a liar during closing argument.  We have reviewed the parties' briefs, the applicable law, the record, and the trial court opinion.  We conclude the trial court's well-reasoned opinion aptly analyzes each of Appellant's assertions of error.  We therefore affirm the judgment of sentence based on the analysis set forth in the trial court's March 2, 2014 opinion.  We direct that a copy of that opinion be filed along with this memorandum.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/23/2015

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0000123-2012

:
:
:
:
v. : 299 EDA 2014

CP-51-CR-0000123-2012 Comm. v. Batson, Nadera
Opinion

NADERA BATSON



7130414291

FILED

MAR 2 4 2014

Criminal Appeals Unit
First Judicial District of PA

OPINION

McDermott, J. **March 24, 2014**

## Procedural History

On July 15, 2011, the defendant, Nadera Batson, was arrested and charged with Murder, Conspiracy, Possession of an Instrument of Crime (PIC), Reckless Endangerment of Another Person ("REAP"), and Endangering the Welfare of a Child ("EWOC"). On August 6, 2013, the defendant appeared before this Court and elected to be tried by a jury.[1]

On August 12, 2013, the jury returned a verdict of guilty as to Third Degree Murder, Conspiracy, PIC, and EWOC.[2] On December 18, 2013, after reviewing presentence and mental health reports, this Court imposed a sentence of twenty to forty years of incarceration for Third Degree Murder, consecutive sentences of seven and one half to fifteen years of incarceration for Conspiracy and one to two years of incarceration for EWOC, and a concurrent sentence of one to two years of incarceration for PIC, for an aggregate sentence of twenty-eight and one half to fifty-seven years of incarceration.

---

[1] On August 2, 2013, her codefendant Marcus King, who testified in this matter as described *infra*, entered a plea to Third Degree Murder, Conspiracy, and EWOC at CP-51-CR-0000121-2012.
[2] The REAP charge was *nolle prossed.*

On December 23, 2013, the defendant filed a timely post-sentence motion, which was denied on December 30. On January 28, 2014, the defendant filed a timely Notice of Appeal, and on February 19, 2014, the defendant filed a timely response to this Court's order pursuant to Pa.R.A.P. 1925(b).

## Facts

Ashley Brewton, the natural mother of the child decedent in this case, allowed the defendant to take him in during March of 2011 because she and her other children were moving into a shelter. Later, they fought over the defendant's attempt to gain legal custody of the decedent. Ashley Brewton last spoke with her son during May of 2011, and did not see him again until his hospitalization at CHOP. N.T. August 8, 213, pp. 155-170.

Marcus King, the defendant's boyfriend and codefendant, testified that they had started dating on December 7, 2009 and moved in together shortly thereafter. He met Ashley Brewton, the decedent's mother, during that time and through the defendant. The decedent was the defendant's godson, and for a time the defendant and King lived with Ashley Brewton and her children. In January of 2011, when the defendant and King had moved to 4716 Chestnut Street, the decedent moved in with them. At that time, and until his death, JaQuinn Brewton had a limited vocabulary of approximately ten to thirty words, and called everyone, including King and the defendant, "mom." N.T. August 8, 213, pp. 9-17.

King acknowledged that during the months when Brewton lived with him and the defendant, he occasionally "put his hands" on the child. He saw the defendant strike Brewton almost daily, using her hands, a belt, a brush, and a shoe. She would do this in response to Brewton's touching things that he was not supposed to touch. Brewton was not potty trained when he came to live with the defendant, and she would beat him in order to punish failures to

2

use his toilet trainer. On a few occasions, King intervened to stop the beatings, which he thought were excessive. *Id.* at 18-31.

King noticed the burns on Brewton's feet, and purchased burn cream and gauze to treat him. King and the defendant discussed taking him to the hospital for his foot burns, but were afraid that they might be arrested if they did so. One or two months later, when Brewton missed his toilet trainer and defecated onto the floor, the defendant burned his buttocks with a blowtorch that King had brought home from his job. King grabbed Brewton and took him into the bathroom, running cold water over his buttocks. When he did so, layers of skin came off in the flow of the water. King dressed his wound with burn cream and gauze. The night before Brewton was taken to CHOP, June 28, 2011, Brewton had trouble getting to sleep and kept getting out of his bed. The defendant beat him and then he went to sleep. *Id.* at 31-55.

Hasan Babb, who lived in the defendant's apartment building at the time when Brewton was under the defendant's care, testified that the building had shared bathroom and kitchen areas, and that he resided in the room next door to the defendant. He said that on several occasions he heard the defendant refer to Brewton as "little motherfucker" or "this little nigger." In the weeks before Brewton's death, there were several midday episodes during which he would hear loud music from the defendant's room, and then underneath the music what sounded like lashes and yelling and crying. He also heard the defendant say "move your hands" multiple times, as well as "stop crying," "shut up," and "sit still." These episodes would occur approximately four times a week, and lasted for approximately one hour each. N.T. August 6, 2013, pp. 98-107.

At one point, Babb's girlfriend was with him in his room during one of the midday episodes of loud music, screaming, crying, and the sound of lashes, and she was upset by it. At her behest, Babb went to the defendant's room and knocked on her door. When the defendant

3

answered, he commented that "it" had been going on for a while, and she responded that she would turn the music off. That seemed to end that particular incident. On another similar occasion, Babb's door was cracked and he saw the defendant and Brewton walking to the communal bathroom and heard the defendant say, on her cell phone, "This little motherfucker shitting the bed." *Id.* at 107-110.

Babb was troubled by what he heard, and he looked at the Department of Human Services ("DHS") website to learn how to make an anonymous tip about what he suspected was child abuse. He also sent a text message to his landlord, in hopes that he might be able to intervene and end the beatings. He wrote "I ain't tryna get involved in other peoples matters. But this woman beats her kid nonstop for hours. Shit just don't seem healthy to me." *Id.* at 110-119; Commw. Exh. 115 (Babb Statement).

On June 29th of 2011, at approximately 11:00 a.m., Lieutenant Dwayne Culbrath of the Philadelphia Fire Department was assigned to respond to an emergency call that a child had fallen down a flight of stairs at 4716 Chestnut Street in Philadelphia. When Culbrath arrived, he went to the defendant's room on the fourth floor of the apartment building, where he saw three-year-old JaQuinn Brewton, dressed only in a diaper, who had no vital signs and appeared to be deceased. Culbrath spoke with the defendant, who told him that she had seen Brewton fall down the stairs, stand up, and then slump against the wall. Culbrath saw that Brewton had multiple dark markings on his torso and arms. N.T. August 6, 2013, pp. 50-59. Brewton went on to spend two weeks in the hospital, and then perish from his wounds.

Philadelphia Police Officer Tameka Terry of the Special Victims Unit took a statement from the defendant on June 29, 2011, in which the defendant told her that Brewton had injured

4

himself by falling down a flight of stairs, and that he burned his feet by stepping into a hot bath. N.T. August 9, 2013, pp. 5-28.

Christine Biggie, Trauma Nurse Practitioner at Children's Hospital of Philadelphia ("CHOP"), gave expert testimony as to her treatment of Brewton in the emergency room. Initially, she noticed there were multiple bruises and cuts and skin marks all over his face and body. She also took pictures of his body, including detailed photographs of his numerous wounds, as a part of her compilation of his medical record. She noted that his wounds were at various stages of healing; some were scars, and some were open wounds or bruises. Brewton's body was very lean, and his abdomen was swollen and distended. He had several injuries which were partially healed where it appeared that he was missing small pieces of skin. N.T. August 7, 2013, pp. 95-113.

Biggie observed a burn on Brewton's buttocks, and by its state of healing estimated that it was a week old. The burn did not appear to be from a hot object, which would leave a defined shape or imprint, or a hot liquid, which would leave splash marks that would appear as dots around the greater area of the burn. Biggie determined that it was likely caused by exposure to flame. On both of Brewton's feet, she observed healed second-degree burns caused by a hot liquid, with splash marks around the periphery of the burn area and on his lower legs. The tops of his feet were burned, but the bottoms were uninjured. This is consistent not with stepping into a hot tub, as the defendant reported, but with a spilled hot liquid. *Id.* at 114-125.

Biggie described Brewton's pancreas injury as a laceration followed by severe bruising. He had a similar wound to his spleen. She asked the defendant about the injuries to Brewton's feet, and she told her that Brewton had been taken to another local hospital for treatment of the burns. She explained that he had burned his buttocks by sitting on a hot blowtorch. When

5

Biggie asked if she meant a lighter, she again insisted that it was a blowtorch. The defendant also told Biggie that Brewton had thrown up green vomit the prior week. Biggie noted that this was consistent with a serious pancreas injury, which can cause bile to show up in the injured person's vomit. The defendant also said that Brewton had not had much appetite in the preceding weeks, which was also consistent with a pancreatic injury. *Id.* at 125-140.

Dr. Aaron Rosen, Associate Medical Examiner for the City of Philadelphia, gave expert testimony as to the autopsy he performed on Brewton. As part of his forensic investigation, he reviewed hospital records from Brewton's stay at CHOP from June 29, 2011, to July 12, 2011, when he was finally pronounced dead. Dr. Rosen noted several u-shaped scars on Brewton's body. He also reviewed hospital x-ray results that indicated a potential healing fracture in Brewton's lower left arm. *Id.* at 176-189.

Dr. Rosen explained that pancreatic injuries such as the one Brewton suffered can cause damage to the other abdominal organs when pancreatic fluids leak into the abdomen, and can also cause hypotension and cardio-circulatory impairment, which can rob other organs (such as the brain) of necessary blood-borne oxygen. In response, the brain vasodilates, calling for more blood, but becomes swollen with blood that is deoxygenated. This accounts for Brewton's brain swelling at the time of his death. *Id.* at 190-195.

Dr. Rosen also described linear-pattern scarring on Brewton's legs and left arm, consistent with application of the metal tines of a comb that was found at the defendant's residence. He did not see any scars on Brewton's body that were consistent with an immersion burn, as when a child steps into or is placed into too-hot bathwater; the burn scars on the top of Brewton's feet were instead consistent with the pouring of scalding liquid to the tops of his feet.

6

The healing fracture to Brewton's left arm was consistent with reaching out to stop a fall. *Id.* at 206-223.

Numerous of Brewton's internal organs, including his pancreas, left adrenal gland, and liver, showed fibrosis, consistent with a rupture to the pancreas that causes enzymes to escape into the abdominal cavity and irritate the organs in that cavity. Dr. Rosen found that the injury to Brewton's pancreas was not consistent with a fall down the stairs. Instead, it was consistent with a focused and concentrated blow to the area, as when a child falls into a handlebar while riding a bicycle, or when another person hits the child in the abdomen, either with a hand or a hard object. Because the pancreas is in the middle of the body, it is not typically injured in this directed way when a person falls down the stairs. Stair falls tend to cause injuries to the head and extremities of the body rather than the middle. Dr. Brewton determined that the cause of Brewton's death was blunt impact trauma and the manner of death was homicide. *Id.* at 224-234.

On July 14, 2011, Philadelphia Detective Ronald Sirianni tested the hot water temperature in the bathroom next to the defendant's room at 4716 Chestnut Street, and found that when he ran only the sink's hot water for fifteen to twenty seconds, the water temperature was 132 degrees Fahrenheit and did not burn his hand when he submerged it. He tested the bathtub in the same fashion, and the temperature was 109 degrees Fahrenheit. N.T. August 6, 2013, pp. 185-204. Pursuant to a warrant, Philadelphia Detective Nathan Williams recovered several items from the defendant and her home. These included several lighters and a flexible-necked torch. N.T. August 7, 2013, pp. 35-43.

The defense adduced the testimony of Liana Batson, Janelle Batson, Clarina Harris, and Nahshona Mitchell, the defendant's aunts, as to the defendant's reputation for peaceful

7

nonviolence. N.T. August 9, 2013, pp.77-85; 143-144. Tameka Batson, her mother, testified

that she had seen the defendant care for Brewton but had never seen her mistreat him. *Id.* at 89-

101.

## Issues

On appeal, the defendant argues that this Court erred in overruling a defense objection

during the Commonwealth's closing arguments, that the evidence was insufficient to support the

convictions, that the convictions are against the weight of the evidence, and that the sentence is

excessive and an abuse of this Court's discretion.

## Mistrial

The defendant argues that a comment that the Commonwealth made during closing

arguments justified the defendant's mistrial motion, and that this Court erred in denying that

motion. No relief is due.

During closing arguments, the Commonwealth said "consider that there's no evidence

that he did fall down the stairs except for the defendant who has lied and covered up everything

else that she did." N.T. August 9, 2013, p. 214. The defense made an objection, and this Court

promptly instructed the jury that their recollection of the evidence controls. At the end of the

Commonwealth's closing, this Court denied the defense's mistrial motion. *Id.* at 236-237.

"[T]he remedy of a mistrial is an extreme one ... and the motion for such relief is

addressed to the sound discretion of the court. It is primarily within the trial court's discretion to

determine whether Appellant was prejudiced by the event that forms the substance of the

motion." *Commonwealth v. Montgomery*, 626 A.2d 109, 112 (Pa. 1993)(citations omitted),

abrogated on other grounds, *Commonwealth v. Burke*, 781 A.2d 1136 (Pa. 2001)(dismissal too

8

severe a remedy for Commonwealth failure to disclose evidence). Mistrial is required only when incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial; moreover, it is primarily within trial court's discretion to determine whether defendant has been prejudiced by the event underlying the motion. *Montgomery*, 113.

In *Commonwealth v. Floyd*, 484 A.2d 365 (Pa. 1984), our Supreme Court held that a prosecutor's comment in closing arguments that the defendant lied about a particular statement "was a fair inference from irrefutable evidence, rather than a broad characterization of the whole of the testimony as a 'big lie,' *see Commonwealth v. Kuebler*, 399 A.2d 116 (Pa. 1979)." This instance is much more like *Floyd* than *Kuebler*, in that it was an isolated comment rather than a sweeping one that would render everything that the defendant stated a "big lie," including trial testimony. Here, the defendant elected not to testify, and thus whatever prejudice might have attached to the comment was minimal. Further, the jury was immediately instructed that it was their recollection of the evidence, and not the Commonwealth's, that controls. Jurors are presumed to follow instructions. *See Commonwealth v. Baez*, 720 A.2d 711 (Pa. 1998).

This passing comment by the Commonwealth, which was addressed almost instantaneously by this Court's instruction, in no way had the unavoidable effect of depriving the defendant of a fair trial. That the Commonwealth and the defense disagree as to how Brewton came to be mortally injured is implicit, and thus the impact of the Commonwealth's comment is minimal. This argument is meritless.

Sufficiency of the Evidence

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth*

9

*v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (citing *Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005).

18 Pa.C.S. § 2502 establishes that Murder in the Third Degree is any murder that is not committed as an intentional killing, and is not committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony. Third-degree Murder is a killing with malice. *See Commonwealth v. Thomas*, 717 A.2d 468, 479-80 (Pa. 1998). In *Commonwealth v. Ludwig*, 874 A.2d 623, 631-632 (Pa. 2005), the Supreme Court explained:

> In determining whether malice has been established, our Court has utilized the traditional definition of that mental state set forth in *Commonwealth v. Drum*, 58 Pa. 9 (1868). That seminal definition makes clear that malice aforethought requires a unique state or frame of mind characterized by wickedness, hardness, cruelty, recklessness, and disregard of social duty:
> Malice is a legal term, implying much more [than ill-will, spite, or a grudge]. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed. *Id.* at 15.
> Malice has been characterized as exhibiting an "*extreme* indifference to human life," *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007, 1008 (1980) (emphasis supplied), and "may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator 'consciously disregarded *an unjustified and extremely high risk* that his actions might cause death or serious bodily harm.'" *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981) (*quoting Commonwealth v. Hare*, 486 Pa. 123, 404 A.2d 388, 391 (1979)) (emphasis supplied).

Malice may be inferred by considering the totality of the circumstances. *Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. 2011); *see e.g. Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa. Super. 2007)("It was reasonable for the jury to conclude that grabbing Victim, an infant, with enough violence to fracture ribs, shaking him and/or otherwise causing his head to strike an object constituted not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty—*i.e.*, malice necessary to support Appellant's murder conviction"); *Commonwealth v. Kellam*, 719 A.2d 792, 797 (Pa. Super. 1998)(finding evidence sufficient to find appellant acted with malice where appellant left infant in a hot room for a prolonged period of time without feeding the infant).

Here, ample physical and eyewitness evidence established that the defendant, along with Marcus King, beat and abused Brewton for a prolonged period before his death, and denied him appropriate medical care for fear that they might be arrested if his wounds and scars came to light. The defendant struck Brewton hard enough to cause severe, and ultimately fatal, damage to several of his internal organs including his pancreas. This alone establishes malice sufficient to support this conviction. Burning his buttocks with a blowtorch is also an act that establishes the defendant's wickedness of disposition, hardness of heart, recklessness of consequences, and disregard of social duty. The evidence overwhelmingly establishes that the defendant caused Brewton's death, doing so with malice; this claim is meritless.

To sustain a conviction for Conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy. *Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa. Super. 2006)(*citing Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000)). An explicit or formal

11

agreement to commit crimes can seldom, if ever, be proved, but a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. *Commonwealth v. Perez*, 931 A.2d 703, 708-09 (Pa. Super. 2007); *Commonwealth v. Jones*, 874 A.2d 108, 121-22 (Pa. Super. 2005).

The Superior Court has identified four factors to be considered in determining the sufficiency of the evidence supporting the existence of a conspiracy: "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002).

In *Commonwealth v. Geiger*, 944 A.2d 85 (Pa. Super. 2008), *alloc. denied*, 964 A.2d 1 (Pa. 2009), the Superior Court upheld a conviction for Conspiracy to Commit Third Degree Murder where the defendant and her boyfriend both routinely beat four young girls entrusted to their care, and failed to provide adequate food to them. The youngest of them succumbed to a particularly harsh beating carried out almost exclusively by the defendant's boyfriend. The defendant's conviction was upheld, as "[t]he law is well-settled that conspirators are responsible for the actions of their cohorts, whether such conduct is planned by the consortium or engaged in by a conspirator without prior approval of the group." *Id.* at 92. This is especially true where, as here, both defendants struck Brewton and both of them chose not to take him to see a doctor despite his grave wounds, because they feared exposure. The evidence is more than sufficient to support the conviction for Conspiracy, and this argument is meritless.

12

Weight of the Evidence

Weight of the evidence and sufficiency of the evidence are discrete inquiries. An argument that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. *Commonwealth v. Davis*, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial court. *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005)(citing *Commonwealth v. Sullivan*, 820 A.2d 795, 805-806 (Pa. Super. 2003); *Commonwealth v. Widmer*, 744 A.2d 745, 751-752 (Pa. 2000). The Supreme Court has explained that the test is whether the verdict must be so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Diggs*, 949 A.2d 873, 879-80 (Pa. 2008). As the finder of fact is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, for a defendant to prevail on a challenge of the weight, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003).

Specifically, the defendant argues that the greater weight of the evidence does not support the essential elements of malice for murder or agreement for conspiracy. As to conspiracy, where both defendants struck the child victim in each other's presence and each agreed with the other that they would not take the victim to see a doctor for fear of exposure of their heinous acts, this argument is frivolous. As to malice, the discussion of the evidence *supra* appropriately emphasizes the malicious nature of the defendant's behavior, and her wickedness of disposition, hardness of heart, recklessness of consequences, and disregard of social duty. "[M]alice may be found where the defendant has consciously disregarded an unjustified and extremely high risk

13

that her conduct might cause death or serious injury to another." *Commonwealth v. Geiger*, 944 A.2d 85, 90 (Pa. Super. 2008)(*citing Commonwealth v. Young*, 431 A.2d 230 (Pa. 1981)).

Put simply, the overwhelming and one-sided nature of the evidence in this case makes any argument as to the weight of the evidence utterly unavailing. This verdict is entirely consistent with the law and the evidence.

The Sentences Imposed

In her final claim of error, the defendant argues that the sentence is manifestly excessive and an abuse of discretion. This Court imposed a sentence of twenty to forty years of incarceration for Third Degree Murder, seven and one half to fifteen years of incarceration for Conspiracy, one to two years of incarceration for EWOC, and one to two years of incarceration for PIC. All but the PIC sentence are to run consecutive, for an aggregate sentence of twenty-eight and one half to fifty-seven years of incarceration.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002) (citations omitted). On appeal, a sentencing court will not be found to have abused its discretion unless the record reveals that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. *Id.* 42 Pa.C.S. § 9721(b) specifies that "the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant."

In this matter, this Court reviewed pre-sentence reports and mental health reports pertaining to the defendant prior to imposing sentence. This Court heard from numerous

14

witnesses, including several members of the defendant's family. The defendant elected to allocute and made an extended statement, which this Court considered. Finally, taking into account all relevant facts and balancing the needs of the public, the gravity of the offense, and the rehabilitative needs of the defendant, this Court imposed a guideline sentence as to Third Degree Murder and Conspiracy. Specifically, this Court took into account the impact of the defendant's behavior not only on the child victim, but also on his family and on all of the emergency, public safety, and medical workers who were exposed to this unusually graphic and horrifying case. In addition, this Court took into account the ongoing nature both of the defendant's cruel behavior and of the victim's suffering and the defendant's hard-hearted refusal to access medical and supportive services or surrender the victim so that his suffering might be alleviated and his life spared.

As to EWOC, the sentence of one to two years is a guideline sentence and is manifestly appropriate under the circumstances. The defendant chose to take on the responsibility of caring for Brewton, and thus very willfully endangered him. As to PIC, the guidelines call for a sentence of restorative sanctions to one month of incarceration, plus or minus three months. Thus this sentence does represent an upward departure. The grotesquery of the defendant's resort to torture via blowtorch suggests serious depravity, and to be frank, the defendant could easily have been sentenced to more time on other counts in recognition of that fact. Because no lesser sentence would address the crimes charged under our sentencing scheme, this argument is meritless.

15

For the foregoing reasons, the decision of this Court should be affirmed.

BY THE COURT,

Barbara A. McDermott, J.

16