J-S38030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LATIFF HADI, | |
| Appellant | No. 1402 EDA 2016 |

Appeal from the Judgment of Sentence November 26, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005036-2012

BEFORE:  GANTMAN, P.J., SHOGAN and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 18, 2017**

Appellant, Latiff Hadi, appeals from the November 26, 2013 judgment of sentence following his conviction by a jury of third-degree murder, conspiracy to commit aggravated assault, and endangering the welfare of a child on September 27, 2013.  We affirm.

The trial court thoroughly summarized the facts of this horrific crime as follows:

> On March 20, 2012, codefendants Tina Cuffie [("Cuffie")[1]] and [Appellant] were arrested and charged with murder and related charges in the death of their son, Khalil Wimes.[1] . . .

---

[*] Former Justice specially assigned to the Superior Court.

[1] This Court affirmed the judgment of sentence of Appellant's co-defendant, Tina Cuffie, on February 2, 2015.  **Commonwealth v. Cuffie**, 120 A.3d 365, 3597 EDA 2013 (Pa. Super. 2015) (unpublished memorandum).

[1] [Appellant] is also known as Floyd Wimes. [N.T., 9/25/13, at 22].

* * *

Alicia Nixon was approached in 2006 to raise the child victim in this case, Khalil Wimes, who was not yet born but whose parents [Appellant and Cuffie] had three children under the supervision of Philadelphia's Department of Human Services ("DHS"). [Appellant's] mother initially asked if [Nixon] and her husband would take in the unborn child, and then a week after he was born, [Appellant], who is Nixon's cousin, asked if [Nixon] were [sic] still willing to take [in the baby]. When Nixon said yes, [Appellant, Cuffie, Appellant's mother], and a representative of DHS came with Khalil to her home. The DHS permitted [Appellant and Cuffie] to see Khalil, but not to take custody of him because their home was unfit for a child.

For a time, this arrangement was agreeable to all parties, and [Appellant and Cuffie] saw Khalil during the day several times a week but always returned him to Nixon's home at night. Eventually, however, [Appellant] exchanged words with Nixon as he was picking Khalil up for the day, and threatened not to return him to her that evening. Nixon became worried that he would follow through on his threat, and called the police, directing them to meet her at a supermarket where [Cuffie] worked and where [Appellant, Cuffie,] and Khalil frequently spent time together during the day. The police made sure that Khalil was returned to Nixon's care, but shortly thereafter Nixon initiated legal proceedings to gain permanent custody of Khalil. [Appellant and Cuffie] contested custody, and were temporarily awarded custody of Khalil shortly after he turned [one], in February of 2007. One week later, Khalil was returned to Nixon's custody, because [Appellant and Cuffie] had failed to obtain necessary asthma medication and had not followed an appropriate diet for [Khalil], and he had to be hospitalized within a week.

During his first three years when he lived with Nixon, Khalil thrived. He reached early milestones like holding his bottle, crawling, and walking on or ahead of schedule. By the time he was three, he was learning both English and Arabic, and could read certain words and write his name with assistance. He was also a healthy eater. Nixon addressed Khalil's early issues

with asthma and eczema with diet and skin cream, and both cleared up. Nixon kept many photographs she had taken of Khalil, and in those photographs he appears to have a healthy weight, clear, unscarred skin, and a bright demeanor. After March of 2009, when Khalil was removed from [Nixon's] care and returned to [Appellant and Cuffie], who did not allow Nixon any visitation, Nixon did not see [Khalil] again until his funeral.

At approximately 1:00 a.m. on March 20, 2012, Gary Hines, a social worker with DHS, received a hotline call from the Children's Hospital of Philadelphia, ("CHOP") about a child who had recently come to the hospital and was dead. He went to the hospital, as the call indicated that there were other small children in the deceased child's family. There he spoke to the child's parents, [Appellant and Cuffie]. Cuffie told him that Khalil had fallen getting out of the tub. She also told him that [Khalil] would not eat regular food, so they fed him primarily fast food, and that [Khalil] was constantly vomiting. [Appellant] told him that he received a call that Khalil was injured, and then he went to the house and immediately arranged for an elder son to drive them to the hospital.

Hines also observed the body of [Khalil], who at the time of his death was six years of age but appeared to be three years of age and was extremely thin. Hines saw a knot on [Khalil's] forehead and lesions in his mouth, as well as marks up and down his body on both sides. Hines also examined the parents' other minor child, M.W., and saw no evidence of abuse.

Kiwan DaCosta, a social worker at [CHOP], met with [Appellant and Cuffie] at the hospital on the night that Khalil died. [Cuffie] told her that Khalil had fallen during his morning bath and injured his face, but had otherwise had a normal day, and that when she went to check on him in the evening he was not breathing. When DaCosta saw Khalil's body, she immediately noticed that he was emaciated and covered with scars and injuries. Although he was six years old, he looked to her as if he was only three. When [Appellant and Cuffie] indicated to [DaCosta] that they were about to leave the hospital, DaCosta called the police to make sure that they were on their way and would arrive soon. The police arrived before [Appellant and Cuffie] left the hospital.

Philadelphia Detective Mark Webb took a statement from [Appellant] on March 20th, 2012. In that statement, [Appellant] said that Khalil was accident-prone, and that he and [Cuffie] had trouble keeping [Khalil's] weight up because of his vomiting. Philadelphia Detective Michael McGoldrick took a statement from [Cuffie] on March 20th, 2012 at 4:35 a.m. In it, [Cuffie] said that Khalil fell getting out of the bath the prior morning and landed on his face. She also said that Khalil tended to fall frequently and "marked easily."

Philadelphia Detective Gregory Santamala took a second statement from [Appellant] on March 21, 2012 at 2:30 a.m. In it, [Appellant] indicated an awareness that if a doctor saw Khalil's pre-death physical condition, "yes, you would get in trouble." [Appellant] acknowledged that he would "tap him on his butt" but denied using a belt on him. He said that sometimes Khalil was punished by withholding his food from him. [Appellant] also said that he intended to find housing with his [new] girlfriend, . . . and move Khalil in with them at that time.

Philadelphia Detective Howard Peterman took a statement from [Cuffie] on March 21, 2012, at 11:35 a.m., in which she said that as Khalil was getting out of the bathtub on the morning of the day he died, she "popped him in the back of his head and knocked him to the floor," causing [Khalil] to hit his face and split his lip. She also reported that for the rest of the day, Khalil seemed weak, wobbly, and disoriented. When asked if she had hit Khalil in the past, [Cuffie] said she had done so, with her hand and with a belt. When asked how often she would hit him with a belt, [Cuffie] said "it wasn't every day but it was often enough."

Officer Tiffany Richardson of the Philadelphia Police Department's Crime Scene Unit went to [Khalil's] home on March 21st, 2012, to examine where [Khalil] received the injuries that led to his death. She saw, and photographed, several blood-spatter stains on the wall in the main hallway across from the bathroom, in [Khalil's] bedroom, in the bathroom, and on a child's toilet in another bedroom, as well as a hook-and-loop lock at the top of the outside of [Khalil's] bedroom. Subsequent testing revealed that at least one of the blood spatter samples collected from [Appellant's] apartment walls matched Khalil's DNA, as did a sample from the child's toilet; other samples were

- 4 -

inconclusive or did not contain DNA or sufficient DNA for a positive test.

Aaron Cuffie, [Cuffie's] 28-year-old son and Khalil's half-brother, had been told by [Appellant and Cuffie] that they installed the latch on Khalil's door in order to keep him from getting food from the kitchen during the night. [Cuffie] told Aaron that the marks and bruises on Khalil's face and body were from fights with his younger sister, M.W., and from times when he would "hurt himself" while he was being spanked. Aaron saw Khalil the day before he died, when he looked sick and repeatedly passed out. Aaron told [Cuffie] that she should take Khalil to the hospital, and [Cuffie] replied that she was going to do that eventually. The next day, when he came to Cuffie's home and saw that Khalil was unresponsive and appeared not to be breathing, he drove [Appellant and Cuffie] to the hospital with Khalil.

After he found out that Khalil had died, Aaron became very angry with both [Appellant and Cuffie]. At the hospital, [Cuffie] told [Aaron] that she was sorry and [Appellant] told him not to say anything to anybody.

Khalil had been home-schooled by [Cuffie], and at one point [Appellant] told Aaron that this was because [Appellant and Cuffie] did not want anyone to see Khalil and call DHS. Aaron saw Khalil being disciplined by being forced to run up and down the hallway in the family's apartment, and said that [Khalil] would frequently fall while he was running. Aaron said that Khalil frequently vomited after eating, and that [Appellant and Cuffie] would become angry at [Khalil] and punish him when this happened. On the day before he died, Khalil was made to run up and down the hallway as punishment for vomiting, and when he fell and hit his head, [Cuffie] helped him back up and then directed him to continue running.

Kevin Cuffie, the 20-year-old son of [Appellant and [Cuffie], had seen Khalil being sent to stand in a corner for approximately two hours as punishment for transgressions such as getting food from the kitchen without permission. In December of 2011, [Kevin] noticed that Khalil was listless and weak. [Kevin] mentioned this to [Cuffie], who claimed that she was taking him to see a doctor. Kevin also noticed the accumulating scars and bruises on Khalil's body, and saw them

multiply in the months before his death. [Kevin] saw both [Appellant and Cuffie] hit Khalil on various parts of his body as a form of discipline.

Wanda Byrd dated [Appellant] . . . for approximately nine months. Their relationship ended shortly after Khalil's death. In the months prior to [Khalil's] death, Byrd understood [Appellant] to be living with a friend of his near 21st and Mifflin Streets in Philadelphia, and separated from [Cuffie]. [Appellant] told her that Khalil was homeschooled because he was afraid that if Khalil went to school, he and [Cuffie] would get into trouble again with DHS due to Khalil's issues with vomiting and wetting himself. She gave [Appellant] $20 to take Khalil to see someone about his medical issues, but to her knowledge he did not follow through. [Appellant] was with Byrd when [Cuffie] called to tell him that Khalil was unresponsive, at which time he left to join [Cuffie].

Randee Cuffie Shaw, [Cuffie's] 26-year-old daughter and [Appellant's] step-daughter, testified for [Cuffie]. [Shaw] lived with her mother from July, 2011, to January, 2012. During that time, she observed her mother hit Khalil with her hand and with a belt on various occasions, sometimes on his head. She also observed [Appellant] hit [Khalil] with a phone charger cord and with his hand, including at least once on his head. She noticed marks that she thought were made with an extension cord on Khalil's limbs, and said that she has the same marks on her arms, inflicted by [Appellant]. Shaw also saw [Appellant] withholding food from Khalil, and would sometimes sneak Khalil extra food while she lived with him.

Dr. Sam Gulino, Chief Medical Examiner for the City of Philadelphia, gave expert testimony as to the cause and manner of Khalil's death, which he attributed to starvation and physical abuse, including a serious recent blow to the head. [Dr. Gulino] described numerous scars from a looped weapon, such as an electrical cord, which covered Khalil's torso, and head and brain injuries in various states of healing. He also described Khalil's extreme state of starvation, as demonstrated by, for instance, loose folds of skin around his buttocks where fat was once stored.

Trial Court Opinion, 2/10/14, at 1–8 (internal citations and footnotes omitted).[2]

Following the denial of a pretrial motion to suppress, Appellant proceeded to a bench trial with Cuffie on September 25–27, 2013. The trial court adjudged both Appellant and Cuffie guilty of third-degree murder, conspiracy to commit aggravated assault, and endangering the welfare of a child.[3] On November 26, 2013, the trial court sentenced both Appellant and Cuffie to serve terms of twenty to forty years of imprisonment for third-degree murder followed by a consecutive term of ten to twenty years in prison for conspiracy to commit aggravated assault.

Appellant filed a post-sentence motion on December 9, 2013, three days beyond its due date of December 6, 2013. Pa.R.Crim.P. 720 ("[A] written post-sentence motion shall be filed no later than 10 days after imposition of sentence."). The trial court denied the motion on December 11, 2013. Appellant filed a notice of appeal to this Court on January 9, 2014. We quashed the appeal, which was filed forty-four days after the trial court imposed sentence, as untimely on February 4, 2015, holding that "Appellant was thus required to file his notice of appeal 'within 30 days of

---

[2] In its Pa.R.A.P. 1925(a) opinion filed on May 24, 2016, the trial court attached and incorporated its original Rule 1925(a) opinion filed on February 10, 2014.

[3] 18 Pa.C.S. §§ 2502(c), 903(a) and 2702(a)(1), and 4304(a)(1), respectively.

imposition of sentence'—or, by December 26, 2013. Pa.R.Crim.P. 720(A)(3); Pa.R.A.P. 903(a)." ***Commonwealth v. Hadi***, 120 A.3d 368, 377 EDA 2014 (Pa. Super. filed February 4, 2015) (unpublished memorandum at 2).

Appellant filed a *pro se* petition for collateral relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546, on March 24, 2015. New counsel was appointed, who filed an amended PCRA petition on April 6, 2016. The PCRA court reinstated Appellant's appeal rights *nunc pro tunc* on April 28, 2016. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following two issues in this appeal:

A. Whether the evidence was insufficient as a matter of law to sustain Appellant's conviction for murder in the third degree[?]

B. Whether the evidence was insufficient as a matter of law to sustain Appellant's conviction for conspiracy to commit aggravated assault[?]

Appellant's Brief at 6.

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Sanchez***, 614 Pa. 1, 36 A.3d 24, 37 (2011).

"In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." ***Commonwealth v. Fears***, 575

Pa. 281, 836 A.2d 52, 58–59 (2003). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. ***Commonwealth v. Spell***, 611 Pa. 584, 28 A.3d 1274, 1278 (2011). Further, the trier of fact is free to believe all, part, or none of the evidence. ***Commonwealth v. Martin***, 627 Pa. 623, 101 A.3d 706, 718 (2014).

***Commonwealth v. Woodard***, 634 Pa. 162, 129 A.3d 480, 489–490 (2015), *cert. denied sub nom.* ***Woodard v. Pennsylvania***, 137 S.Ct. 92 (2016).

Appellant asserts that the evidence supporting third-degree murder is insufficient because it showed he was "more inept than . . . cruel." Appellant's Brief at 19. Appellant suggests he "lacked the hardness of heart and the malice required for third degree murder," without citing to the evidence that supports that claim. ***Id***. at 19–20. With regard to his conviction of conspiracy to commit aggravated assault, Appellant contends that while he was neglectful, his "conduct and . . . agreement or joint action [with Cuffie] did not rise to the level of intent required under the law." ***Id***. at 20.

Third degree murder is a killing committed with malice. Malice consists of "wickedness of disposition, hardness of heart, wantonness, cruelty, recklessness of consequences, or a mind lacking regard for social duty." ***Commonwealth v. Devine***, 26 A.3d 1139, 1146 (Pa. Super. 2011) (quoting ***Commonwealth v. Johnson***, 719 A.2d 778, 785 (Pa. Super. 1998)). The malice required for third degree murder does not require a specific intent to kill. It "is an intentional act, characterized by malice, that

- 9 -

results in death, intended or not." ***Commonwealth v. Fisher***, 80 A.3d 1186, 1191 (Pa. 2013).

Conspiracy to commit aggravated assault encompasses the following:

**§ 2702. Aggravated assault**

**(a) Offense defined.**—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

18 Pa.C.S. § 2702.

Criminal conspiracy is governed by Section 903 of the Crimes Code:

**(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person . . . to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person . . . that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903; ***Commonwealth v. Chambers***, 157 A.3d 508, 512 (Pa. Super. 2017).

In response to these claims, the trial court stated the following, in pertinent part:

Here, ample physical and eyewitness evidence established that both defendants routinely struck and otherwise abused their child victim with their hands and with belts and cords, and that

- 10 -

both defendants were complicit in denying him food, thus weakening him, and keeping him away from school and from medical care in order to cover up their own abuse. This latter point shows not only that they placed their own concerns before the very real medical and developmental needs of their child victim, but it also demonstrates their consciousness of their culpability and their conspiracy to hide their victim, thus prolonging the time during which they might beat and starve him.

The defendants worked in concert to perform, over time, three separate courses of action that each establishes their extreme and hardhearted indifference to Khalil's life and well-being. First, they starved him so severely that he appeared to be a child of half his age and thereby, for all practical purposes, utterly arrested his normal physical and intellectual development. In doing so, they went so far as to punish him by withholding food and putting a lock on his door so that he could not obtain food on his own. Second, knowing the weakened state into which they had reduced him, they nevertheless beat him ruthlessly, covering his diminished body with scars. They did not spare his head, despite the fact that it is obviously a vital area. Third, they withheld medical care, in order that their behavior might not be subject to scrutiny and in order that they might continue to treat him in this appalling and obviously malicious manner. It is beyond cavil that their behavior establishes the requisite legal malice to support their convictions for Third Degree Murder, and this argument is meritless.

\* \* \*

In *Commonwealth v. Geiger*, 944 A.2d 85 (Pa. Super. 2008), *alloc. denied*, 964 A.2d 1 (Pa. 2009), the Superior Court upheld a conviction for Conspiracy to Commit Third Degree Murder where the defendant and her boyfriend both routinely beat four young girls entrusted to their care, and failed to provide adequate food to them. The youngest of them succumbed to a particularly harsh beating carried out almost exclusively by the defendant's boyfriend. The defendant's conviction was upheld, as "the law is well-settled that conspirators are responsible for the actions of their cohorts, whether such conduct is planned by the consortium or engaged in by a conspirator without prior approval of the group." *Id.* at 92. There, as here, any codefendant quibbles over who was the

primary abuser of the child are irrelevant, both to the murder charge and to the charge of Conspiracy to Commit Aggravated Assault. This is especially true where, as here, both defendants acknowledged either to their adult children or to police that they, in concert, avoided permitting Khalil to go to school or taking him to see a doctor because they were afraid of getting into trouble. The evidence is more than sufficient to support [Appellant's] conviction[] for Conspiracy, and this argument is meritless.

Trial Court Opinion, 2/10/14, at 10–12.

We have reviewed the complete record and considered the arguments of the parties and the applicable law. The record fully supports the existence of ample and sufficient evidence to uphold the verdicts of third-degree murder and conspiracy to commit aggravated assault.[4]

_____

[4] We are compelled to comment on the apparent failure by Philadelphia Department of Human Services to intervene in this case. Detective Michael McGoldrick presented a statement from Cuffie dated March 20, 2012, in which Cuffie stated that DHS closed Khalil's case on March 6, 2009. N.T., 9/27/13 at 132. Ms. Nixon, who raised Khalil the first three years of his life, testified she "begged" DHS to permit visitation with Khalil after he was thrust into Appellant's and Cuffie's care in 2009, but they refused, and eventually, "stopped tak[ing her] calls anymore." N.T., 9/26/13, at 63.

It is noteworthy that no one from DHS testified at trial. Instead, on September 27, 2013, the final day of trial, all counsel stipulated to presentation of the structured progress notes prepared by Courtnei Nance, DHS caseworker for five of Appellant's and Cuffie's eight children, who had been removed from their care in 1995. N.T., 9/26/13, at 103; 9/27/13, at 99–102. These notes, prepared on April 4, 2012, and admitted into evidence as Collective Exhibit C-88, N.T., 9/27/13, at 102, are not included in the record certified to us on appeal. The progress notes stated that Ms. Nance had "face-to-face" visits at Appellant's and Cuffie's home on November 26, 2011, and December 27, 2011, at ARC on February 4, 2012, at the home on February 18, 2012, and at ARC on March 3, 2012. N.T., 9/27/13, at 99–102. Khalil was present at all of the meetings. *Id*.
*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/18/2017

(Footnote Continued) ─────────

Recalling that Khalil died on March 20, 2012, these meetings occurred in the sixteen months preceding Khalil's tragic death and as recently as mere weeks before the child's murder. All family witnesses at trial testified to the drastically changed appearance of this little boy. All family witnesses testified there was an obvious latch on the outside of the child's bedroom door. All witnesses testified to the bruises and scars readily apparent all over Khalil's emaciated body. In Appellant's March 20, 2012 statement to Detective Mark Webb of the Special Victims Unit, Appellant revealed, admittedly without providing a date, that "the DHS caseworker asked us if [Khalil] was okay because he would throw up and do stuff while she was there." N.T., 9/26/13, at 108. All of these facts raise the unsettling question of whether our child welfare system failed this six-year-old boy as he was starved and tortured during the latter half of his life.