J-S36011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                 :                PENNSYLVANIA
                                                 :

              v.                              :
                                               :

DARRYL RAY GATES                :
                                             :

            Appellant                 :        No. 1144 WDA 2024

Appeal from the Judgment of Sentence Entered May 1, 2024
In the Court of Common Pleas of Erie County
Criminal Division at No(s):  CP-25-CR-0000398-2022

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:           **FILED: December 10, 2025**

Darryl Ray Gates appeals from the judgment of sentence imposed for his convictions of first-degree murder, two counts of aggravated assault, and a single count of firearms not to be carried without a license, possessing instruments of crime, simple assault, recklessly endangering another person, conspiracy to commit homicide, theft by unlawful taking or disposition, receiving stolen property, and flight to avoid apprehension, trial or punishment.[1] Gates challenges both the sufficiency and weight of the evidence, and asserts he is entitled to credit for time served. After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2702(a)(1), 2702(a)(4), 6106(a)(1), 907(b), 2701(a)(1), 2705, 903(a), 3921(a), 3925(a), and 5126(a), respectively.

On November 17, 2021, co-defendant Aiyanna Atkinson complained to Gates, her cousin and co-defendant, about her belief that Tariq Sheppard, an ex-boyfriend, broke into her friend's house and broke Atkinson's iPad and stole her phone. This alleged break-in occurred two weeks prior to November 17, 2021. Atkinson never went to police regarding these allegations. At the time she told Gates, she was frustrated and wanted her phone and iPad back, by any means necessary. Atkinson told Gates she planned on confronting Sheppard and asked him to come with her. Initially, Gates told her that if there was going to be fighting, he wanted nothing to do with it. Atkinson told him that was fine, and called her other cousin, Javon Cason, another co-defendant, for his assistance.

Cason and Atkinson spoke through a video call, while Gates was still in the room with Atkinson. When Cason told Atkinson to come over to his house to discuss the situation further, Gates asked if he could come along. Cason agreed, and both Atkinson and Gates drove to Cason's house. On the way to Cason's house, Atkinson pointed out where Sheppard lived.

While at Cason's house, they discussed their plans. Atkinson told them, "I just want my things back. I want him to pay for what he did, like basically pay for what he broke. And if he doesn't have it, like—and I honestly said I don't even care if you guys have to rob him." N.T. Trial, 3/6/24, at 123-24. In response to that, Cason asked her what was in Sheppard's house. Gates also asked who was in Sheppard's house.

After this discussion, Gates and Cason started talking about a rifle that was in the room. Atkinson briefly left the room. When Atkinson returned, she saw Cason hand Gates a handgun. Gates asked Cason if the serial numbers were still on the handgun. Atkinson then drove Gates and Cason to Sheppard's house.

On the way to Sheppard's house, Atkinson was told to stay in the car when they arrived at Sheppard's home and let Cason and Gates handle it. She agreed, parked and remained in her car while Cason and Gates went to Sheppard's house. As can be seen on the surveillance video, after a few minutes of Cason knocking on Sheppard's door with no answer, Cason kicked Sheppard's door. Gates stood around the corner out of view of the front door of Sheppard's house. Someone finally answered the door and Sheppard stepped outside on his porch while Cason stepped down off the steps.

Sheppard testified and explained that initially, it was only Cason outside his house. Cason asked him if he broke into and stole Atkinson's iPad or laptop. The conversation with Cason lasted only a few minutes but Sheppard did not feel comfortable based upon the tone of Cason's voice. Cason asked Sheppard to step off the porch and he refused. Then Gates stepped out from his hiding spot around the corner and Sheppard felt that he was "probably in danger." N.T. Trial, 3/7/24, at 124. Sheppard believed Gates had a firearm in his pocket based upon the way that Gates was holding his hands in his hoody pocket.

Ultimately, Sheppard denied breaking in, and either taking or breaking any of Atkinson's property, and Cason and Gates walked away.

They returned to Atkinson's car and told her that Sheppard denied everything. Atkinson was not pleased, so they decided to go back to confront Sheppard again. Before they could, they saw Sheppard driving away with his current girlfriend, Rhonda Glover, in the passenger seat. They believed Sheppard was leaving because he was lying to them. They decided to follow Sheppard.

Sheppard realized he was being followed by Atkinson and started to drive at a high rate of speed. Atkinson kept up with him. Sheppard, in an attempt to ditch Atkinson, turned the wrong way down a one-way street. Atkinson continued to follow. Glover told Sheppard to go to her sister's house and Sheppard complied. Once Sheppard parked in front of Glover's sister's house, Gates jumped out of Atkinson's moving car and opened fire. Glover was killed when a bullet struck her in the head. Sheppard was able to avoid getting hit by running into Glover's sister's house. Gates jumped back into Atkinson's car and they fled the scene.

As they fled, Cason gave Atkinson directions and told her to turn off the headlights on her car. Atkinson complied. Atkinson heard Cason tell Gates "to give me that." *Id.* at 153. Atkinson believed Cason was asking for the firearm. Cason then told Atkinson to stop the car, and he got out alone. Cason was out of the car for less than a minute before he returned. At that time, he told

Atkinson to take him home. After they arrived at Cason's house, Atkinson asked what she was going to do now. Cason replied "I don't know what you going to do but don't bring my name up into it." *Id.* at 157. Gates then helped Atkinson remove her vanity license plate and replace it with the old license plate. Cason allowed Atkinson to leave her vanity license plate at his house. Atkinson decided to go to her grandparents' house and dropped off Gates at a store on her way. That night, Atkinson was arrested at her grandparents' house.

Two days later, Marisol Ceron started her day like any other. She went outside to warm up her truck, a Chevy Tahoe, before leaving for work. She turned on her truck, put the window down, and went back inside her house. A few minutes later, she heard her truck driving away and ran outside. She saw the truck backing down the road. Initially, she ran after it. But then she turned around and called police.

Police filed charges against Atkinson, Gates, and Cason for the murder of Glover. An arrest warrant was issued for Gates. Gates was arrested on the warrant in Baltimore, Maryland several days after the November 17, 2021, shooting. Gates was in possession of Ceron's stolen Chevy Tahoe at the time of his arrest.

Prior to trial, Atkinson pled guilty to third-degree murder and agreed to testify against Gates and Cason. Gates and Cason were tried at a joint jury trial held March 4, 2024, through March 12, 2024. Gates was convicted of the

charges noted above and sentenced to life in prison without parole for his conviction of first-degree murder.

Gates filed a timely post-sentence motion. After oral argument, the court denied the motion. Gates timely appealed and complied with the court's order to file a Rule 1925(b) statement, and the court filed a Rule 1925(a) opinion on November 14, 2024. *See* Pa.R.A.P. 1925(a), (b).

Gates presents the following three questions for our review:

> 1. Is the evidence insufficient to sustain the conviction for conspiracy to commit homicide where the Commonwealth conceded that homicide was not the object of the conspiracy?
>
> 2. Did the trial court abuse its discretion when it denied [Gates'] motion for a new trial as the convictions were against the weight of the evidence?
>
> 3. Did the trial court err when it failed to properly credit [Gates] for the time served from the date of his arrest until his extradition to Erie County?

Appellant's Brief, at 9 (suggested answers and lower court's answers omitted).

Gates first argues the evidence was insufficient as to his conviction of conspiracy to commit homicide. *See id.* at 41. He asserts, without supporting case law, that the Commonwealth was required to show an agreement to commit homicide and without such an agreement, there was insufficient evidence for his conviction. *See id.* We disagree.

The scope and standard of review regarding sufficiency claims is as follows:

> Because a determination of the sufficiency of the evidence presents a question of law, our standard of review is de novo and

our scope of review is plenary. Further, we analyze this issue under the following guidelines:

> When reviewing challenges to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. Moreover, this Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed. Lastly, we note that the finder of fact is free to believe some, all, or none of the evidence presented.

***Commonwealth v. Henck***, 342 A.3d 726, 731-32 (Pa. Super. 2025)

(citations, italics, and quotation marks omitted).

Conspiracy is defined as:

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

Furthermore:

To convict [a defendant] of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. An explicit or formal agreement to commit crimes can seldom, if ever, be proven and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relationship between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

Once a conspiracy is established, the actions of each co-conspirator may be imputed to the other conspirators. In this regard, the law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design.

> Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties.

*Commonwealth v. Geiger*, 944 A.2d 85, 90-91 (Pa. Super. 2008) (citations, quotation marks, and brackets omitted).

Further, this Court explained "conspirators need not contemplate the ultimate crime in order to be charged and convicted of conspiracy to commit that crime[. T]he conspiracy to commit an overt act binds the conspirators to

- 8 -

the foreseeable consequences of the conduct." *Commonwealth v. Arrington*, 247 A.3d 456, 462 (Pa. Super. 2021) (ellipsis and citation omitted). As our Supreme Court explained, "one does not conspire to commit a denominated offense; one conspires to engage in certain conduct." *Commonwealth v. Fisher*, 80 A.3d 1186, 1195 (Pa. 2013).

In other words, it does not matter that there was no express conversation or agreement to kill Glover. Armed with a firearm, the conspirators here—Gates, Cason, and Atkinson—followed Sheppard and Glover at a high rate of speed, the wrong way down one-way streets, and Gates opened fire on Sheppard and Glover. Atkinson detailed their conspiratorial agreement to rob Sheppard during her testimony and Gates took the agreement one step further when he shot and killed Glover. Gates agreed to be a part of the conspiracy and committed more than one overt act in furtherance of the conspiracy. As such, his first claim fails.

Gates next argues his convictions were against the weight of the evidence. *See* Appellant's Brief, at 43. Gates submits Atkinson's admission to lying and omitting important details requires reversal of his convictions. *See id.* at 44. Further, he claims the lack of forensic evidence connecting him to the shooting supports his request for a new trial. *See id.* at 47-48. We disagree.

A weight of the evidence claim "is addressed to the [sound] discretion of the trial court." ***Commonwealth v. Dortch***, 343 A.3d 298, 306 (Pa. Super. 2025) (citation omitted).

> Where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion on ruling on the weight claim.
>
> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interests of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained the term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Id.*** (brackets and citations omitted).

Cogently, the trial court held:

[The] specific recitations set forth in paragraphs 3a and 3b of [Gates' post-sentence motion] mainly focused on the testimony

- 10 -

and credibility of co-defendant and cooperating Commonwealth witness, Aiyanna Atkinson. [Gates] contends that since the jury found co-defendant Cason not guilty of certain offenses involving the firearm that they must not have believed some of Atkinson's testimony and therefore the jury should not have believed any of her testimony. The argument follows that since they should not have believed any of her testimony that the verdicts were against the weight of the evidence. The [trial] court disagree[d]. The fact that the jury determined that co-defendant Cason was not guilty of two offenses involving the gun, and what may have happened to it after the shooting does not mean they chose to disregard all of her testimony, or that they should have.

… [The trial] court specifically finds that the verdicts were supported by the evidence, both direct and circumstantial, and that the jury performed their duty and followed the specific instructions provided to them by the [trial] court in making factual and credibility determinations, such as examining the credibility of co-defendant Atkinson, and deciding whether to believe all, some, or none of her testimony.

A significant amount of evidence, both direct and circumstantial, corroborated much of Atkinson's trial testimony. It should be noted that a defendant may be convicted on the uncorroborated testimony of an accomplice so long as the jury scrutinizes that testimony carefully because of the corrupt source doctrine. However, corroborated accomplice testimony can render that testimony more dependable. *See Commonwealth v. Larew*, 432 A.2d 1037 (Pa. Super. 1981). Although the defense at the time of trial focused its cross-examination and closing arguments on the credibility of Atkinson, the record is also clear that a significant factor in the jury's determination may have been the testimony of Tariq Sheppard, who was with Rhonda Glover throughout the course of the incident, including when she was killed. At the time of trial, [] Sheppard specifically testified that as he parked the car he was driving, which had been followed at a very high rate of speed by the vehicle which contained Atkinson, Gates and Cason, he witnessed defendant Gates exit the vehicle and saw him raise a firearm and open fire into the vehicle. He identified [Gates] by articles of clothing that [Gates] was wearing, and there was further forensic evidence which corroborated his testimony regarding the hat that [Gates] was wearing at the time of the shooting. The same hat was determined to have gunshot residue and [Gates'] DNA on it.

- 11 -

> There was also testimony and other evidence to establish the offenses which occurred after the homicide, such as theft, receiving stolen property and flight.
>
> To summarize, the guilty verdicts were supported by direct and circumstantial evidence to allow the jury to find that [Gates] was proven guilty beyond a reasonable doubt for each of the counts. None of the verdicts "shocked" [the trial] court's sense of justice.

Opinion and Order Denying Post-Sentence Motion, 9/5/24, at 3-5 (unnecessary capitalization omitted).

Gates has not convinced us that the trial court abused its discretion and we find no error in its analysis. Atkinson explained to the jury why she was not truthful with police: "I knew I was going to be ending up telling on family." N.T. Trial, 3/6/24, at 168. The jury was entitled to weigh this testimony along with the remainder of her testimony and decide whether to believe all, part, or none of it. *See Henck*, 342 A.3d at 732. Furthermore, forensic evidence is not required for a conviction. In considering all the evidence detailed above, we find Gates' second claim meritless.

Finally, Gates argues he is entitled to time credit between his arrest and extradition back to Erie County, Pennsylvania. *See* Appellant's Brief, at 49-50. Although this claim was not raised with the trial court, Gates asserts it is a non-waivable challenge to the legality of the sentence. *See id.* at 48-49. Gates concedes the trial court ordered time credit at sentencing but asserts the time credit imposed on the sentencing order was incorrect. *See id.* at 49-50.

Gates is correct that a challenge to time credit is a non-waivable challenge to the legality of the sentence. *See Commonwealth v. Miller*, 655 A.2d 1000, 1001 n.1 (Pa. Super. 1995). However, there is nothing within the certified record that supports Gates' claim that he was arrested and incarcerated solely on the warrant from Erie County on November 21, 2021. *See* Appellant's Brief, at 49.

Without record evidence to support his claim that he is entitled to additional time credit, we cannot find his claim meritorious. "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (en banc) (citation omitted). Because we have no evidence of Gates' extradition within the certified record, we do not have anything to compare the credit imposed with the credit to which Gates asserts he is entitled.

As such, we affirm Gates' judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/10/2025

- 13 -